1  JAMES A. LASSART (SBN 40913)
   MURPHY, PEARSON, BRADLEY & FEENEY
2  88 Kearny Street, 10th Floor
   San Francisco, CA 94108
3  Telephone:    (415) 788-1900
   Facsimile:    (415) 393-8087
4  Email:        JLassart@mpbf.com

5
   Attorneys for Defendant
6  Joseph Vesce

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11  UNITED STATES OF AMERICA,              Case No.  CR 13-00415 PJH

12              Plaintiff,                 **DEFENDANT JOSEPH VESCE'S
                                           SENTENCING MEMORANDUM AND
13        v.                               MOTION FOR PROBATIONARY
                                           SENTENCE**
14  JOSEPH VESCE,

15              Defendant.                 Date:      December 20, 2017
                                           Time:      01:30 p.m.
16                                         Judge:     Hon. Phyllis J. Hamilton
                                           Ctrm:      3
17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION                                                                    1

II.     FACTUAL BACKGROUND                                                     1

III.    THE AGREED GUIDELINE CALCULATION FOR VESCE WITH A DOWNWARD
        DEPARTURE INDICATE A SENTENCE TO A PROBATIONARY TERM            3

IV.     THE SENTENCING CRITERIA OF 18 U.S.C. SECTION 3553 ALSO POINTS TOWARDS
        SENTENCING TO A PROBATIONARY TERM                                     3

        A.     Nature and Circumstances of the Offense                          4

        B.     Section 3553(a)(1):  Vesce's History and Characteristics          4

               1.     Exemplary Character                                        4

        C.     A Sentence of Probation Is All that Is Needed to Accomplish Distributive Justice and
               Avoid Undue Disparities under 18 U.S.C. § 3553(a)(6)             6

        D.     Section 3553(a)(2):  General Purposes of the Criminal Justice System.   6

               1.     Just Punishment                                           6

               2.     General Deterrence                                        7

               3.     Specific Deterrence                                       7

               4.     Rehabilitation                                            7

V.      ADDITIONAL SENTENCING CONSIDERATIONS                             7

        A.     Downward Departure – Care Taking                               7

VI.     CONCLUSION                                                             9

Case No.
                                                                    CR 13-CR-00415-PJH

# TABLE OF AUTHORITIES

**Page**

## Cases

*Gall v. United States*
    552 U.S. 38 (U.S. 2007)...................................................................................................3

*United States v. Booker*
    543 U.S. 220 (U.S. 2005)................................................................................................3

*United States v. Carty*
    520 F.3d 984 (9th Cir. 2008)........................................................................................3, 6

*United States v. Espinoza-Cano*
    F.3d 1126 (9th Cir. 2006)...............................................................................................3

*United States v. Smart*
    518 F.3d 800 (10th Cir. 2008)..........................................................................................6

## Statutes

15 United States Code
    § 1................................................................................................................................1

18 United States Code
    § 3553(a) ....................................................................................................................3, 4

## Other Authorities

U.S.S.G.
    § 5H1.6..........................................................................................................................7

## I.    INTRODUCTION

Joseph Vesce ("Vesce") stands before the Court having pled guilty to 15 U.S.C. § 1 of the Sherman Act (Bid Rigging), and having accepted responsibility for his offense conduct and the harm he caused. In all, the sentencing agreement identifies a level 13 exposure and a recommended restitution amount of $52,550.00.

In addition, the defendant has agreed to and has fully and completely cooperated with the authorities including at least eight (8) separate meetings and debriefings with Government counsel beginning late 2013 with additional interviews in preparation for his testimony at the trial of *US v. Joyce Thomas* in 2017 when Vesce testified before a jury and provided truthful testimony, outlining the complete details of the scheme, his role and the various participants as he knew them. In addition, Mr. Vesce also was prepared for but was not called to testify in a subsequent trial. In short, Joseph Vesce provided "substantial" assistance to the government and it will result in the government's filing a motion pursuant to U.S.S.G. § 5K1.1 recommending that the court apply a downward departure from the guidelines.  A downward departure of at least two levels will place Mr. Vesce at the top of Zone B in category one and eligible for probation.

## II.    FACTUAL BACKGROUND

Joseph Vesce was born in New York but raised locally in the Bay Area from the age of 1. His parents were both from working class families and came to the Bay Area for better opportunities and a more family friendly environment to raise their growing family. Vesce enjoyed a normal childhood, in a home with three brothers and an intact family which remains close to this date.

Growing up in a Catholic household Vesce attended catholic school for much of his childhood and due to his upbringing Vesce donated a great deal of time to charity. He traveled to Mexico on three occasions as part of a group to build homes for those in need. Vesce also worked with local children in his hometown to assist them in adapting to new schools.   Vesce now, as a property manager, personally subsidizes housing costs for some local families when they are in his units and cannot afford the rent.

After graduating from St Mary's College in Moraga Vesce went to work in the corporate world but later left to run his own business.

Vesce was married in 2013 to his wife Karen and they now have two small children ages three and two. Mr. Vesce is responsible for the daily childcare of his children as a full time father and is also a full-time property manager who works from home. Karen is fully employed outside of the home.

Vesce's education began at St Peters' Grammar School in Lafayette, CA and then he attended Stone Valley Middle School in Alamo, CA. He graduated from San Ramon Valley High, in Danville, CA and matriculated to St Mary's College of Moraga where he graduated in 2000.

Vesce began to attend the daily foreclosure auctions in Contra Costa County beginning in December 2008. He became involved in purchasing foreclosed properties when he and Shannon Phillips ("Phillips"), a family friend, decided to create a plan to purchase properties at foreclosure, add capital improvement, and resell those properties. Phillips solely owned and managed the property management companies – Pacific Growth's Properties, Pacific Growth Realty Advisor's, LLC and their attendant funds LLP's and LLC's. Phillips raised 100% of the capital and owned the businesses.

Vesce and Phillips, however, were partners only in the labor portion of the venture. Vesce was not a partner in the management or the compensation from the company. Phillips and Vesce were on different compensation structures. Phillips owned the business and his compensation was directly tied to the returns through fees from the investors of the Pacific Growth Reality Funds as the General Partner. Vesce's compensation was not tied to performance of the funds.

Phillips' compensation was derived from a 25% share of profits from the company plus 1% of the acquisition fee, a 5% fee for construction management of rehabilitation cost ($500--$600 on average per property) and 1% disposition fee plus reimbursement expenses for running the partnership.

Vesce's compensation came solely from the acquisition and sale of the property; 1% of acquisition fees, 5% fee for construction management of rehabilitation cost ($500--$600 on average per property) and 1% disposition fee's with no profit share.

When Vesce began attending the auctions he was unaware of the bid-rigging scheme. Unlike the regular auction attendees he neither actively worked for nor worked in the past with any of the regular bidders. As a result he subsequently bore the brunt of criticism from the professional buyers. He was routinely marginalized at the auction because he did not participate in the bid-rigging scheme. After clashing daily with the regular bidders for approximately 6 months Vesce joined the scheme and,

1  now as he remorsefully admits, began to engage in the bid rigging activity. Vesce purchased his first

2  foreclosed property on April 19, 2009 (Jackson Pl, Antioch, CA.); that purchase was neither illegal nor

3  the result of a bid rigging scheme. Vesce first participated in the bid-rigging scheme on July 15, 2009,

4  when he purchased two properties.  (Pacheco St, Concord, CA and El Toro Way, Pinole). As shown in

5  the Government's video evidence, Vesce participated until approximately January 2011.

6  **III.      THE AGREED GUIDELINE CALCULATION FOR VESCE WITH A DOWNWARD**
   **DEPARTURE INDICATE A SENTENCE TO A PROBATIONARY TERM**
7

8          The federal sentencing Guidelines are no longer binding but advisory. (*See, United States v.*

9  *Booker,* 543 U.S. 220, 244-246 (U.S. 2005) "The overarching statutory charge for a district court is to

10  impose a sentence sufficient, but not greater than necessary…" (*United States v. Carty,* 520 F.3d 984,

11  991 (9th Cir. 2008) (en banc).) In that spirit, the Supreme Court has directed the sentencing judge not

12  to presume "that the Guidelines range is reasonable," and instead it should "make an individualized

13  assessment based on the facts presented."  (*See, Gall v. United States,* 552 U.S. 38, 52 (U.S. 2007) the

14  sentencing judge should consider "every case as a unique study in the human failings that sometimes

15  mitigate, sometimes magnify, the crime and the punishment to ensue".)

16  **IV.     THE SENTENCING CRITERIA OF 18 U.S.C. SECTION 3553 ALSO POINTS**
   **TOWARDS SENTENCING TO A PROBATIONARY TERM**
17

18          The Guidelines calculation is only a "starting point" to the sentencing calculation. (*See, e.g.*

19  *United States v. Espinoza-Cano,* F.3d 1126, 1128 (9th Cir. 2006).) In the wake of *Booker,* a trial court

20  may not "presume that the Guidelines range is reasonable." (*Gall v. United States,* 552 U.S. 38, 50

21  (U.S. 2007).) It must make an individualized assessment of the appropriate sentence based on the

22  particular facts of the case and the defendant's circumstances, in light of the factors set forth in

23  18 U.S.C. Section 3553(a). (*United States v. Carty,* 520 F.3d 984, 991 (9th Cir. 2008) (en banc).)

24  Though Courts often begin with a Guideline calculation, the calculation may not "be given more or

25  less weight than any other" sentencing factors of 18 U.S.C. Section 3553(a). (*Id.*)

26          The overarching principle in the analysis is that the Court "shall impose a sentence sufficient,

27  but not greater than necessary, to comply with the purposes [of sentencing]." (*Id.; see also* 18 U.S.C.

28  Section 3553(a).) This is especially important where, as here, the recommended Guideline range is

- 3 -

affected by Mr. Vesce's cooperation, true remorse, and family care. 18 U.S.C. Section 3553(a) requires that the four sentencing factors, discussed below, be given equal weight.

**A.      Nature and Circumstances of the Offense**

As the Presentence Report ("PSR") recognizes, Vesce admits participating in a conspiracy to rig bids in foreclosure auctions in Contra Costa County from approximately July 2009 until approximately January 2011. There is little dispute about the facts of Vesce's involvement because he has readily admitted his conduct as well as explained his interactions with others on multiple occasions during his substantial cooperation with the Government. Vesce reviewed videos and identified individuals, documents and recalled various discussions. The PSR also recognizes that this is a singular aberrant episode in Vesce's long law abiding life. In reviewing the surrounding circumstances of the auctions it is clear that Vesce never intimidated or coerced any individuals from or into participating in the bid-rigging. In fact, his demeanor was always one of an affable person with a moderating personality.

**B.      Section 3553(a)(1):  Vesce's History and Characteristics**

**1.      Exemplary Character**

Mr. Vesce has submitted three insightful character letters which highlight his excellent qualities. A common factor in all of the letters is that his offense conduct is aberrational and atypical in the full context of Vesce's law abiding life.

As seen through the eyes of his character advocates, Vesce has conducted his life from the time of his early upbringing, through his education, and ultimately his marriage and family in an exemplary and commendable manner.  Vesce's friends and family have in the past and still appreciate him as a responsible and honest person.

Doctor Mark Sembrat's letter reflects that Mr. Vesce was:

> "…so deeply sorry and ashamed of his actions … that he actively contemplated not getting married and having kids out of fear that his wrongdoings would be a liability to those he cares about most." (Exhibit A)

Dr. Sembrat continues to explain that Vesce is so remorseful and ashamed of his conduct that he went so far as to offer his wife the option of not being married because he was fearful that his actions would

- 4 -

tarnish her and their future children's good name and reputation. Dr. Sembrat's observation is echoed in the letter of Vesce's childhood friend Shane Keohe.

Mr. Keohe states that in their over twenty years of friendship, he came to know

> "… Joe as the type of person with the integrity to acknowledge humbly when he is wrong, rights his wrongs, and accepts the consequences of his actions." (Exhibit B.)

Shane Keohe's analysis is borne out in this case. Vesce has done precisely what Mr. Keohe predicts. Vesce has accepted his responsibility and entered an agreement with the Government to cooperate. Vesce is attempting to right his wrongs and in doing so he has provided substantial assistance to the Government. Vesce has been forthright in his interaction with the Government since he agreed to cooperate. He has testified in a direct and credible manner, accepted his responsibility, admitted his wrongdoing, and demonstrated sincere remorse.

Dennis Hendricks ("Hendricks"), a close childhood friend of Joseph Vesce's, reflects on Mr. Vesce's bid rigging offense as something that he would

> "…never have thought that Joe would ever be involved in any kind of criminal conduct." (Exhibit C.)

Mr. Hendricks states that he knows that Vesce is a decent hard working person who Hendricks would readily accept as member of any team he assembled. He also describes how Vesce has informed him and his other friends of his wrong doing and observes that Vesce has taken full ownership of his wrongdoing. Mr. Hendricks explains Mr. Vesce's embarrassment, not only focuses on himself, but because he has hurt his family and friends.

Vesce's character references all admire his dedication and devotion to his family. As reflected throughout their letters and in the PSR, his family, friends and even the unbiased individuals of USPO see the strong and genuine bond between Vesce, his wife and his children. They all express that he is a responsible caregiver to his children. These facts dictate that it is essential that Vesce's familial role continue uninterrupted as the linchpin/caregiver to maintain his family's integrity.

As Vesce explained to USPO, his history of community service was largely accomplished when he was in school and traveled to build homes for the needy in Mexico. He candidly explains that, because of his family obligations today, his community service is no longer as visible as in the past,

- 5 -

but it is accomplished when he reduces the rent of various tenants based on their need so that they will be able to maintain their family's home.

## C.     A Sentence of Probation Is All that Is Needed to Accomplish Distributive Justice and Avoid Undue Disparities under 18 U.S.C. § 3553(a)(6)

A sentence of probation with the agreed restitution and a fine is just punishment for Vesce. There is no doubt that Vesce will not reoffend. Joseph Vesce fits within that category of individuals who recognize their conduct, understand it was wrong, admit their wrongdoing, provide an honest narrative of the offense conduct, and testify truthfully giving a complete rendition of the events.

Vesce's family background, his current family commitment, and his substantial assistance to the Government dictate that an adequate punishment for Mr. Vesce exists in a combination of the stigma of a felony conviction, his placement on probation, his payment of the agreed restitution and a fine.

A review of other sentences for similarly situated defendants in this matter provides guidance. In comparison, factors such as Vesce's shorter length of time in the conspiracy and his similar volume of commerce provide context for sentencing criterion.

In comparison, Vesce's volume of commerce is smaller than that of Douglas Ditmer ("Ditmer") (12-cr-00448-PGH), and larger than Stan Kahan ("Kahan") (13-cr-00412-PJH) placing him in the middle. In both those instances they, like Mr. Vesce, had a raw guideline score of 13 and then became the beneficiary of a Government 5K1.1 motion. Courts recognize that District Courts may consider the need to avoid unwarranted disparities between similarly situated defendants and may compare defendants when deciding a sentence (*United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008).) Both Ditmer and Kahan received a probationary sentence, restitution, a fine, a special assessment and 3 years of supervised release.

## D.     Section 3553(a)(2):  General Purposes of the Criminal Justice System.

### 1.     Just Punishment

Adopting the type of information described above, the Court is directed to administer just punishment meaning the degree of punishment sufficient but not greater than necessary (*United States v. Carty* 520 F.3d 984, 991 (9th Cir. 2008 (en banc)).)

- 6 -

Added to that information is the fact that Vesce works from home and cares for his two small children. He is the parent responsible for taking them to and from school and maintaining their routine. His role is crucial within the family structure and should not be disturbed.

**2.      General Deterrence**

Vesce recognizes that there needs to be general deterrence and he submits the general deterrence has already begun with the substantial step of his public admission of wrongdoing, and the resultant exposure to public attention with its humiliation and embarrassment.  These facts alone provide an object lesson to the public at large.

**3.      Specific Deterrence**

The guidelines recognize that non-custodial sentences for certain non-violent offenders are available.  Vesce represents the offending group recognized as presenting very little risk of recidivism. Vesce is a devoted family man who clearly understands what he has lost and what he could lose if he ever reoffended. The PSR also recognizes the unlikelihood of Vesce being a future offender.

The Sentencing Commission has also found that first offenders like Vesce are rarely reconvicted of a crime. In fact, only 3.5% of first offenders with zero criminal history points are ever reconvicted[1]. Vesce has zero criminal history points, and given his lifestyle, remorse and subsequent behavior there is no risk of future criminal conduct.

**4.      Rehabilitation**

Vesce submits that he does not require any specific medical, vocational, or therapeutic treatment.

**V.      ADDITIONAL SENTENCING CONSIDERATIONS**

**A.      Downward Departure – Care Taking**

The proffered downward departure is also warranted because of Mr. Vesce's total involvement in his children's caretaking.

According to U.S.S.G. § 5H1.6, (note 1B):

/ / /

---

[1] (*U.S. Sentencing Comm'n, Recidivism and the First Offender* at Exhibit 6 (May 2004).)  Only 11.7% of all first offenders ever find themselves back in the criminal justice system (defined as reconviction, re-arrest, or revocation). (*First Offender* at Exhibit 6 and page 13 of 31) (Exhibit D)

(B)    Departures Based on Loss of Caretaking or Financial Support. – A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:

(i)    The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

(ii)    The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.  For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

(iii)    The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

(iv)    The departure effectively will address the loss of caretaking or financial support.

In accordance with the above, Vesce's financial and caretaking responsibilities along with his substantial assistance to the Government certainly warrant a probationary sentence.

When determining an appropriate sentence, the Court must find a solution that is "sufficient, but not greater than necessary".  Particularly in light of recent legislation aimed at reducing the bloated prison system which is at over 30% overcapacity, addressing BOP budgetary problems, and overcrowding, it is counterintuitive to incarcerate a defendant for any term who has provided substantial assistance, possesses no characteristics leading to a fear of reoffending especially because of his role as the family care taker and is truly remorseful. The Court must consider a sentence that makes sense and is tempered and balanced considering all of the objectives of sentencing.

/ / /

/ / /

/ / /

/ / /

| DEFENDANT JOSEPH VESCE'S SENTENCING MEMORANDUM | Case No.<br>CR 13-CR-00415-PJH |
|---|---|

## VI.    <u>CONCLUSION</u>

For the foregoing reasons, Joseph Vesce respectfully requests a probationary sentence, with the agreed restitution of $52,000 (to be paid over time), a fine of no more than $20,000, a special assessment, and 3 years of supervised release.


Dated: December 13, 2017

MURPHY, PEARSON, BRADLEY & FEENEY


By <u>/s/ JAMES A. LASSART</u>
        James A. Lassart
        Attorneys for Defendant
        JOSEPH VESCE

3184934

DEFENDANT JOSEPH VESCE'S SENTENCING MEMORANDUM

Case No.
CR 13-CR-00415-PJH

EXHIBIT A

12/4/17

The Honorable Phyllis J. Hamilton
United States District Judge
Ronald V. Dellums Federal Building
And United States Courthouse
1301 Clay Street
Oakland, CA 94612

Re: United States v. Joseph Vesce

Dear Honorable Judge Hamilton,

By definition a letter of recommendation is just that, a recommendation based on
morals, character and list of strengths. When Joe asked me if I could share my thought on
his character, it was not a difficult task.  Many years ago Joe confided in me that he was
involved with rigging bids at the courthouse steps.  It was a time where many houses
were being foreclosed and the opportunity presented itself. I don't condone what was
done but suspect he was caught up in the frenzy of the situation. In fact, I know during
conversation he and I have had that he's deeply sorry and ashamed of his actions. As a
result of his actions Joe carries the burden. Joe actively contemplated not getting married
or having kids out of fear that his wrongdoings would be a liability to those he cares
about most. I know Joe is thankful his wife declined that option but he will always have
that fear. I can attest that his involvement in these events is uncharacteristic from the
person that I grew up with and someone I call a friend for the past 28 years.

I know Joe to be responsible, honest, and courteous. He has always been a person
of high moral character and is active in his community.  He is hard working and will tell
you the way it is. He rarely speaks of it but he's made it a point to assist his tenants that
are good people in their own right, in need of a little support, by renting them properties
at discounts to the current market rents. That's the type of person he is and expects from
others. If Joe see's something inherently good in a person or family he will do everything
possible to help pull that family or person up. He understands the desire for working
families to better their lives. He is fair and at the same time Joe remains committed to his
family and the community.  I have watched how he, his wife, and his kids formed a
strong bond and how his kids look up him. I know he spends nearly every waking hour
with his children handling his property management responsibilities before they wake,
the few hours they are at preschool, and after they go to sleep at night. It's a grueling
schedule. I also know if he is ever given the opportunity with his time he always chooses
to spend that time with his family.

It comes to no surprise that he accepted responsibility for his conduct and was
cooperative in the process. It is my sincere hope the court takes this letter into
consideration at the time of his sentencing. Despite the current case, I believe Joseph

Vesce to be and honorable individual and a valuable member of my community, and a good human being.

Sincerely,

EXHIBIT B

November 20, 2017

The Honorable Phyllis J. Hamilton, United States District Judge
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street
Oakland, CA 94612

Shane M. Kehoe
1032A Montgomery Street
San Francisco, CA 94133

Re: United States v. Joseph Vesce

Dear Honorable Judge Hamilton:

Thank you for taking the time to read my letter regarding Joe Vesce. My name is Shane
Kehoe, and Joe Vesce and I became friends shortly after college two decades ago.

Joe and I met in 1997 through a mutual friend of ours. Immediately, Joe expressed his
trust and generosity to me when on the way out to dinner one evening. I privately asked
him if he would mind lending me some money on a promise to pay him back later that
that night. Without hesitation and with only knowing me for a few hours Joe gladly lent
me money more then I asked. He came through for me then, and on so many other
occasions. Joe is just as generous and good-natured today, and over the 20 years since, he
has remained a great friend of mine. He's always there if I ever need to talk about the
hardships of life, and he's the type of person who would take my call in the middle of the
night should I ever be in crisis. Thankfully, I've not had to test him on that theory to date.

Over the years I've seen Joe meet and marry his wife, recently have children, and evolve
now into dedicated family man. Besides managing his own business, he is the primary
caregiver to his two toddlers. It's a feat that I haven't witness among any other friends.
Joe has always been a kind and considerate person, the type of citizen willing to stop and
help a fellow man or woman in need. Over all the years, I've know Joe to have a level-
head and a calm temperament while still having a no-nonsense way about him which I
view as positive.

From what Joe has told me about his bid rigging case, I know that he is remorseful and
regretful. I know the case ways heavily on his mind with regard to his extended family,
young children and wife. To me, Joe is the type of person with the integrity to
acknowledge humbly when he is wrong, rights his wrongs, and accepts the consequences
of his actions. Joe is an outstanding member of the community, caring, and
compassionate to all he comes in contact with.

Sincerely,

Shane M. Kehoe

EXHIBIT C



12/1/2017

United States v. Joseph Vesce


Dear Honorable Judge Hamilton,

I appreciate you taking the time to read my letter regarding Joe Vesce. My name is Dennis Heinrichs and I have known Joe for over 30 years. We are childhood friends and remain close friends to this day. Joe is a trustworthy person that was raised with a high standard of morals and ethics. As a youth and adult Joe Vesce volunteered and supported his East Bay community through the local Catholic Church. When the church had any events or holiday activity, Joe and his family would be there to assist anyway they could. This positive and helpful attitude of Joe's spills over into all parts of his life. From helping me with moving several times in my life to finding that taxi cab that got us home safely, he is a true friend. I understand that Joe Vesce has plead guilty to a bid rigging offence. At no time in my life would I have thought Joe would ever be involved in any kind of criminal act. He has always been a decent hardworking person that you would want to hire or be on your team. I know that Joe takes full ownership of his wrong doing and is embarrassed that he has hurt his family and friends by being part of this illegal act. The Joe Vesce I know will learn from this mistake and move forward to prove to his family and friends that he is the trustworthy person I have known since childhood.


Sincerely,

Dennis Keith Heinrichs, II

EXHIBIT D



RESEARCH SERIES ON THE RECIDIVISM OF
FEDERAL GUIDELINE OFFENDERS

RELEASE 2

# RECIDIVISM
# AND THE "FIRST OFFENDER"

A COMPONENT OF THE
FIFTEEN YEAR REPORT
ON THE U.S. SENTENCING COMMISSION'S
LEGISLATIVE MANDATE



May 2004

## RUBEN CASTILLO
*Vice Chair*

## WILLIAM K. SESSIONS, III
*Vice Chair*

## JOHN R. STEER
*Vice Chair*

## RICARDO H. HINOJOSA
*Commissioner*

## MICHAEL E. HOROWITZ
*Commissioner*

## MICHAEL E. O'NEILL
*Commissioner*

## EDWARD F. REILLY, JR.
*(Ex officio)*

## DEBORAH J. RHODES
*(Ex officio)*

**Commission Staff**

Linda Drazga Maxfield
Miles Harer*
Timothy Drisko
Christine Kitchens
Sara Meacham

*while serving at the U.S. Sentencing Commission



The "first offender" philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment. Congress itself in the Sentencing Reform Act of 1984 promotes the first offender philosophy, citing the relevance of reduced sentencing levels for first offenders under the federal sentencing guidelines.[1]

Under federal sentencing guidelines, offenders with the least number of prior criminal convictions are classified into Criminal History Category I ("CHC I"). As developed by the initial Commissioners, CHC I is more broadly defined than "first offenders." While offenders with zero criminal history points are included, CHC I also applies to offenders with a prior conviction receiving one criminal history point. Further, any offender in CHC I may have one or multiple additional prior convictions if such convictions are excluded from receiving points under the Chapter Four definitions.

Following the adoption of federal sentencing guidelines in 1987, the U.S. Sentencing Commission initiated several investigations to refine a workable "first offender" concept within the guideline criminal history structure.[2] Staff working groups started by analyzing the first offender in terms of CHC I. Using district court data supplied through the Commission's sentence monitoring function, subsequent working groups concluded that a narrower first offender definition better identified those deserving the least severe sentence than did the broad definition of first offender appearing in 28 U.S.C. § 994(j).[3] Each successive working group built upon the previous efforts and designed its set of first offender eligibility criteria. Over time, the proposed first offender definitions grew generally more restrictive, with one definition even requiring that first offenders have no criminal events, not even prior arrests.

The efforts of these past criminal history staff working groups have not resulted in a guideline amendment to establish a first offender provision. In part, this stems from unresolved policy and legal issues, such as the accuracy and appropriateness of prior arrest reporting or the availability of prior court disposition data. The inaction also is tied to incomplete information on the impact of a first offender provision.

Prior research by staff working groups documented how the various first offender definitions reflected low culpability characteristics central to the guidelines' Chapter Four. Their proposed first

---

[1]28 U.S.C. § 994(j).

[2]U.S. Sentencing Commission, 1989; 1990; 1991a and 1991b; 1997; Ricca, 1997; 2001a; O'Neill, 2001.

[3]28 U.S.C. § 994(j)) describes a "first offender" as one who "has not been convicted of a crime of violence or an otherwise serious offense."

offender definitions captured offenders with few or no prior criminal history events, where prior events that were present were not serious. What the prior staff working group research did not – and could not (because of data unavailability) – address was an evaluation of recidivism behaviors under various alternative first offender definitions.

This report responds to the previous lack of empirical information on offender recidivism by drawing upon the Commission's 2003 recidivism project data. Extrapolating from the results of previous working groups' first offender analyses, this report presents a set of alternative first offender definitions. It documents the characteristics of offenders meeting the proposed alternatives, illustrating that those meeting the definitions are unique among federal offenders in terms of low culpability. The analysis then underscores the distinctive characteristics of the proposed first offender groups by presenting their consistent patterns of lower recidivism rates. The research goal is to identify criteria that define a low culpability and low recidivism first offender grouping as a first step in the development of a possible guideline revision.

## A. Commission Focus on First Offender Issues

The first offender adjustment was first studied at the Commission in late 1989 as part of a larger proposed revision of the criminal history chapter. This effort suggested that an additional CHC for "true" first offenders be developed in order to differentiate between offenders whose instant offense was their first contact with the criminal justice system and offenders whose instant offense was not their first contact with the criminal justice system.[4] A staff criminal history working group generated two alternative proposals for handling first offender issues. The first proposal classified all defendants with zero criminal history points as "true" first offenders and redistributed all remaining offenders among the six pre-existing CHC categories. The second proposal classified only those defendants with no prior "criminal trouble" as "true" first offenders. The staff defined "prior criminal trouble" to mean any prior arrest, whether or not it led to a conviction. However, two factors caused the criminal history working group to recommend that the Commission further study the issue prior to any action. The first factor was the cited unreliability of arrest records at that time. The second factor was the existing §4A1.3 (adequacy of the CHC) guideline that expressly stated that the presence of a prior arrest by itself was not sufficient justification for a sentence enhancement.

Approximately one year later, in late 1990, the Commission staff again addressed the subject of the first offender as part of a larger review of the criminal history chapter. A criminal history working group noted that CHC I offenders represented a wide variety of characteristics and offenses. There even were great differences among offenders with zero criminal history points: some had convictions that did not receive points, while others had no prior arrests at all. Taking these differences into account, the working group defined the "true" first offender as any defendant who

---

[4]U.S. Sentencing Commission, 1989.

had no prior convictions nor prior criminal conduct.[5]   Due to constitutional and policy considerations, the criminal history working group did not advocate excluding defendants from a first offender adjustment based solely on prior arrests or charges not leading to convictions. However, the criminal history working group maintained that provisions could be drafted in such a way that any "proven" criminal conduct would exclude a defendant from first offender status.

In October of 1991, another staff criminal history working group circulated its report.[6] After an extensive case review, the criminal history working group divided the defendants with zero points into three groups: (1) "true" first offenders," (2) first offenders, and (3) other offenders with zero criminal history points.  Offenders in the first group, "true" first offenders, were defendants with no prior contact with the criminal justice system of any kind. Those in the second group, first offenders, were offenders with prior arrests or dismissed charges.  All remaining zero point offenders were in the third group.[7]   Simultaneously with the release of this criminal history report, a separate preliminary report by a sentencing alternatives working group discussed a possible sentencing reduction for the first offender:[8] a two-level reduction for offenders who had zero criminal history points and used neither violence nor weapons during the instant offense.  The significance of this proposal was that it both responded to the intent of 28 U.S.C. §994(j) and finessed the need to create a new "first offender" CHC.[9] The sentencing alternatives working group also described another first offender approach permitting first offenders access to probation or prison alternatives.

A criminal history working group established in fiscal year 2000 again examined first offenders and other issues regarding the criminal history chapter.[10]  In a more empirical context, this working group pursued similar definitions of first offenders.  Most recently, in a 2001 law review article, Commissioner Michael O'Neill identified and described first offenders sentenced under the federal sentencing guidelines.[11]   Among other things, the article applied the first offender label to those without any prior convictions and suggested that first offender provisions could be incorporated into the guidelines either as a new first offender CHC or as a guided downward departure.  The article ended by recognizing the limitations of a first offender analysis without the empirical advantage of recidivism data, recognizing that recidivism data permit complete

[5]U.S. Sentencing Commission, 1990. The "true" first offender also included offenders whose only convictions were for minor offenses listed in guideline §4A1.2(c)(2) as never receiving criminal history points under the guidelines: hitchhiking, juvenile status offenses and truancy, loitering, minor traffic offenses such as speeding, public intoxication, vagrancy, and offenses "similar" to these, "by whatever name they are known."

[6]U.S. Sentencing Commission, 1991a.

[7] Offenders in this third group, even though having zero criminal history points, could have prior convictions that did not receive points because of the guideline exclusion rules (e.g., decay factor, juvenile status offense, etc.).

[8]U.S. Sentencing Commission, 1991b.

[9]28 U.S.C. §994(j) states in part that, "the Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense  . . . "

[10]U.S. Sentencing Commission, 2001a.

[11]O'Neill, 2001.

descriptions of the past criminal behavior of potential first offender groupings.  In addition, the access to recidivism data allows researchers to fully analyze recidivism risk under alternative first offender definitions and compare this risk to repeat offenders.

## B.  Looking at First Offenders with Recidivism Data

It is, in fact, this lack of access to a recidivism datafile that kept the Commission from acting on a first offender proposal.  The previous criminal history working groups described potential first offender groups using the following types of available information: number of offenders in CHC I, number of criminal history points, number of prior convictions, or types of prior convictions. Although theoretically and conceptually rigorous, these analyses could not access re-offending outcomes for first offenders.  In order to address all relevant sentencing goals with criminal history measures, estimates are needed of recidivism rates and re-offending risks associated with any potential first offender grouping.  Whereas these data did not previously exist, in the intervening years the Commission launched a major study of recidivism under the guidelines.

The Commission's recidivism project datafile contains details on the offenders' prior criminal history, including both arrests and convictions, characteristics of the instant offense, demographic information, and subsequent re-offending.  This made it possible for the first time to examine and compare in-depth background and recidivism behavior among plausible first offender groupings.  The recidivism project collected data for more than 6,000 U.S. citizen offenders sentenced in fiscal year 1992.

The recidivism data analysis reveals, across different groupings of offenders, that some types of offenders recidivate at higher rates than others.  Assessing this information helps in differentiating among the first offender definitions not only for descriptive classifications but also for additional predictive criteria relevant to first offender analyses.

## C.  Proposed First Offender Definitions

Prior criminal history working groups identified the best theoretical and practical source of first offenders as defendants in CHC I with zero criminal history points.  The annual proportion of federal offenders with zero criminal history points is substantial.  In fiscal year 2001, more than four out of every ten federal offenders (42.2%) had zero criminal history points for their Chapter Four computation.[12]   This proportion was even higher in fiscal year 1992, when nearly half (49.9%) of citizen offenders had zero criminal history points.

Even within the group of offenders with zero points, additional distinctions are possible.

---

[12] U.S. Sentencing Commission, 2001b.

Past research at the Commission differentiates among zero point offenders based on the offenders' numbers of prior arrests and prior convictions.[13]  Synthesizing the definitions of first offenders that arose from prior Commission working group studies, the following three groups emerge.

### Three Proposed Federal First Offender Groups

| Proposed First Offender Groups | Zero Criminal History Points? | Prior Arrests? | Prior Convictions? | % of All Citizen Offenders |
|---|---|---|---|---|
| **A** *(no arrests)* | Yes | No | No | 29.8 |
| **B** *(no convictions)* | Yes | Yes | No | 8.4 |
| **C** *(minor conv. only)* | Yes | Yes | §4A1.2(c)(2) offenses only | 1.5 |

All three groups require that the offenders have zero criminal history points.  Group A offenders have no prior arrests.  Group B offenders have prior arrests, but no prior convictions.  Group C offenders can have prior convictions, but they must fall under the minor offenses listed in guideline §4A1.2(c)(2) that never count toward criminal history points.[14]

Of the 1992 annual total of 29,749 citizen offenders, 8,854 offenders (29.8%) are in group A.  A total of 2,499 fiscal year 1992 offenders (8.4%) are in group B, with 460 offenders (1.5%) in group C.  The substantial number of offenders potentially meeting a first offender definition is impressive:

- for all citizen offenders sentenced in fiscal year 1992, roughly 40 percent (39.7%) meet the definition of group A, group B, or group C, and

- for all citizen offenders sentenced in fiscal year 1992 *and having zero*

---

[13]A prior conviction may be excluded from the criminal history computation if, for example: it occurred outside of a five- or ten-year specified time frame; if it was a Native American or foreign conviction; if it was related to the instant offense;  if it were a minor offense and met specified conditions; etc.

[14]The §4A1.2(c)(2) listed offenses that never receive points under the guidelines are: hitchhiking, juvenile status offenses and truancy, loitering, minor traffic offenses such as speeding, public intoxication, and vagrancy.  Offenses "similar" to these, "by whatever name they are known," also never receive criminal history points.  A previous criminal history working group suggested that offenders with only §4A1.2(c)(2) "never count" convictions be included in the first offender definition.  These "never count" minor offenses are consistent with a first offender criterion because their presence does not improve recidivism prediction, as documented in the companion recidivism project report, "The Exclusionary Rules."

*criminal history points*, roughly 80 percent (79.5%) meet the definition of group A, group B, or group C.

Note that the impact of the definitions is cumulative.  If group A is accepted as a first offender definition, the tabulation above shows that nearly 30 percent (29.8%) of all citizen offenders would be eligible for first offender status.  However, if group B is accepted as a first offender definition, then group A (having no prior criminal history arrests) is also accepted by default.  Thus the sum of offenders in either group A or group B accounts for 38.2 percent of all citizen offenders.

## D.  Characteristics of the Proposed First Offender Groups[15]

T his section of the report highlights the uniqueness of offenders in the proposed first offender groups by describing their demographic, personal, social, instant offense, prior arrest history, conviction history, and sentencing characteristics.  These comparisons serve as a prelude to the later description of recidivism rates, underscoring the distinctive nature of offenders who have only minimal experience with the criminal justice system.

Comparisons are made among the three groups themselves, between the three groups and CHC I offenders with only one criminal history point, and between the three groups and all remaining offenders with more than one criminal history point (and therefore in CHC II through CHC VI).[16]  The characteristics discussed include demographic and personal characteristics, instant offense and sentencing characteristics, and recidivism risk.

### 1.  Demographic, Personal, and Social Characteristics

Exhibits 1, 2, and 3 provide descriptions of a wide range of offender characteristics at the time of the guideline sentencing.

#### Gender

Exhibit 1 displays gender differences between group A, B, and C offenders and offenders with criminal history points.  In every column the greater percentage of offenders are male.

---

[15]Note that for completeness, Exhibit 1 through Exhibit 6 include a "remaining zeroes" group of citizen defendants. These offenders are those with zero criminal history points but not covered by the definitions of groups A, B, or C (i.e., they have non-minor prior convictions that do not receive any points due to guideline exclusionary rules). In total, this "left-over" zero group constitutes 10.2 percent of all citizen offenders.  The "remaining zeroes" group appears on the exhibits in this report to provide a comparison with the three potential first offender groups.

[16] CHC II through CHC VI are combined in the exhibits of this report.  However, the characteristics by the individual CHCs appear in a companion recidivism project report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

However, the proportion of women reaches nearly 40 percent (37.4%) in first offender group A, decreasing to 26.1 percent in group B and 22.3 percent in group C  These are all substantially higher female proportions than for offenders with one criminal history point (14.4%) or all offenders in CHC II through CHC VI (9.1%).

<u>Race and Ethnicity</u>

White offenders comprise a higher proportion (between 66.1%, 58.9%, and 62.0%, respectively) of offenders in groups A, B, and C than offenders in CHC II through VI (50.0%). While the proportion of White offenders decreases with increasing prior criminal history, the reverse is true for Black offenders.  Offenders in CHC II through VI are more likely (41.8%) to be Black than are offenders in groups A, B, or C (22.8% , 29.5%, and 27.2%, respectively).  Group A has the highest percent of White offenders (66.1%) and the lowest percent of Black offenders (22.8%). Hispanic proportions are generally comparable across the columns of Exhibit 1.

<u>Age</u>

There is a positive association between age and the amount of prior criminal history. Offenders in group A are unique in their high concentration of older offenders: over 35 percent (35.4%) are age 41 years or older.  The proportion of offenders over 50 years of age is higher in groups A, B, and C (between 8.6% and 12.5%) than for offenders with one criminal history point (4.2%) or with more than one criminal history point (5.4%).

<u>Illicit Drug Use</u>

Exhibit 2 presents information on social behaviors by first offender group status.  In all cases, offenders in proposed first offender groups A, B, and C generally exhibit what are traditionally considered the most socially positive characteristics.  For instance, 45.6 percent of offenders in the higher CHCs used illicit drugs in the year prior to their instant offense.  For group A, B, and C offenders, however, illicit drug use in the year prior to their instant offense never exceeds 27.8 percent and is lowest for group A offenders (20.9%).

<u>Employment Status</u>

Exhibit 2 also shows that employment rates for groups A, B, and C are comparatively high (greater than 80%) as are employment rates for all offenders with zero or only one criminal history point at 79.5%.  In contrast, the employment rate for offenders in CHC II through CHC VI is lower at 67.6 percent.

Marital Status

Offenders in all groups A, B, and C of Exhibit 2 are most likely to be legally married.  This is true especially for group A, where almost half (48.0%) are married.  In contrast, offenders in CHC II through CHC VI are most likely to have never married (40.2%).

Mental Illness

Exhibit 3 shows that the percentages of mental illness do not substantially change between the first offender groups and offenders with more criminal history.  Data from the PSRs indicate that reported mental illness rates are nearly constant across the columns of Exhibit 3, varying between 8.3 percent and 11.6 percent.

Military Service

Rates of military service only vary slightly across the Exhibit 3 columns.  Between 13.3 percent and 22.4 percent of offenders served in the military.  Groups A, B, and C do not have the highest rates of military service.

Educational Attainment

Offenders in groups A, B, and C are more likely to have a high school diploma, and even some college training, than are offenders with one or more criminal history points.  Exhibit 3 indicates that over 70 percent of those in the first offender groups graduated from high school, with an additional approximate one-third of potential first offenders having at least some college education.  These high school graduation rates are equivalent to those of the general U.S. population in 1990.[17]  For offenders in CHC II through CHC VI, however, only somewhat more than half (55.8%) have at least a high school diploma, with 15.1 percent having at least some college-level training.

Financial Dependents

Over half (52.4%) of offenders in CHC II through CHC VI do not have any financial dependents.  Defendants in first offender groups A, B, and C are more likely to have dependents; but still, only between 38.4 percent to 43.6 percent of these low criminal history offenders have no dependents.  The finding is consistent with higher rates of married offenders in groups A, B, and C.

---

[17]Bauman and Graf, 2000, report that 25 percent of the adult population age 25 and over in 1990 did not have a high school degree.

### 2. Instant Offense and Sentence Characteristics

Exhibits 4 and 5 examine the instant offenses of the group A, B, and C offenders and compare them to offenders with more extensive criminal histories.

<u>Primary Sentencing Guideline</u>

Drug trafficking offenses (§2D1.1) are the most common instant offense types for all columns in Exhibit 4. Group A is the least likely (26.1%) to have an instant offense under §2D1.1, followed by group C (34.6%). All other columns have at least 40 percent of instant offenses sentenced under drug trafficking guidelines.

Group A is unique in that a large proportion (almost half) of its instant offenses are sentenced under §2F1.1 fraud (25.3%) and §2B1.1 theft (23.2%). Group B has 23.5 percent of its instant offenses sentenced under these two guidelines, with group C having one third of its cases sentenced under these two guidelines. For offenders in CHC II through CHC VI, only 16.9 percent of instant offenses are under §2F1.1 fraud and §2B1.1 theft.

In contrast, almost one quarter of the instant offenses in CHC II through CHC VI are sentenced under §2K2.1 weapon offenses (14.3%) or §2B3.1 robbery (9.4%). In groups A, B, and C, these two guidelines account for less than 8 percent of sentencings. The proportion of weapon and robbery instant offenses is even smaller in group A, where they account for only 2.3 percent of sentencings.

<u>Dangerousness of Instant Offense Conduct</u>

During project data collection from the PSR, three types of dangerous behaviors were coded from the section on instant offense conduct. These behaviors include weapon presence during the offense, actual or threatened violence, and actual or threatened injury to a victim. Exhibit 4 shows the occurrence of any one of these behaviors. Groups A, B, and C are the least likely to have dangerousness conduct during the instant offense. The percentages range from a low of 9.3 percent for group A to a high of 18.4 percent for group B. Dangerous instant offense behavior is far more likely for offenders with criminal history points: 22.4 percent for offenders with one criminal history point, and 32.9 percent for offenders in CHC II through CHC VI.

<u>Culpability Criteria</u>

A central tenet behind the first offender philosophy is that first offenders are less culpable than other offenders. The bottom panel of Exhibit 4 displays four criteria generally associated with less culpable criminal conduct: no use of violence or weapons; no bodily injury of a victim; a minor

role or minimal participation in the instant offense, and acceptance of responsibility.[18]

As an offender meets more of the four of these criteria, the offender is considered less culpable and thus might be more deserving of a reduced sentence. The last line of data in Exhibit 4 shows the percentage of each column meeting all four of these criteria. Group A offenders, by far, are the least culpable offenders with 73.8 percent meeting all four criteria. In contrast, the most culpable offenders are in the higher CHCs: only 49.5 percent of offenders in CHC II through CHC VI meet all four criteria.

For groups B and C, and for offenders with one criminal history point, between 61.8 percent and 71.2 percent of offenders meet all four criteria.

Type of Sentence

Exhibit 5 illustrates that offenders in groups A, B, and C are less likely to receive a straight prison sentence than the offenders in CHC II through CHC VI (87.1%). Group A particularly stands out with less than half (41.2%) receiving a straight prison sentence. Consistently, group A offenders also stand out in that 30.3 percent received a probation only sentence. This is almost twice the rate at which group B and group C offenders receive probation only sentences, and six times higher than the 4.9 percent of offenders in CHC II through CHC VI. Both group A and C first offenders were much more likely than any other grouping of offenders to receive probation with an alternative sentence.

Length of Sentence

The length of imposed instant offense sentences are substantially higher for offenders in the higher CHCs. For all offenders in CHC II through CHC VI, a total of 24.2 percent have sentences between two and five years, with an additional 79.9 percent having sentences longer than five years. This is in sharp contrast to first offender groups A and C where sentences over five years are given to roughly 12 percent of offenders (12.8% and 11.4%, respectively) and sentences between two and five years are given to 11.5 percent of group A offenders and 18.2 percent of group C offenders.

Mitigating Role

Exhibit 5 illustrates that the guideline mitigating role adjustment to reduce the offense level was infrequently given: only 5.6 percent among all offenders in CHCs II through VI received this adjustment. First time offenders were overall, only slightly more likely to receive this adjustment.

---

[18]These general criteria reflect those currently existing in the guidelines under §5C1.2 with respect to certain drug trafficking offenders convicted under statutory minimum sentences. Here, however, their presence is measured for all instant offenses as a quantifiable proxy for lessened culpability.

### 3. Summary of Offender and Offense Characteristics

Offenders in the proposed first offender groupings A, B, and C are readily distinguishable from offenders with one or more criminal history points. The proposed first offender groups are more likely to be White and older. Substantially higher proportions of first offenders are female than for other offender groupings. They are more likely to have committed a fraud or larceny instant offense. They have less violent instant offenses, receive shorter sentences, and are less likely to go to prison. They are less likely to use illicit drugs, more likely to be employed, more likely to have a high school education (or beyond), and more likely to have financial dependents. Finally, offenders in groups A, B, and C, compared to other guideline offenders, have instant offenses that are less culpable and less dangerous.

These distinctions demonstrate that any implementation of a first offender provision will not only impact a large percentage of the federal caseload, but it will proportionally benefit offenders in certain demographic, social, personal, and offense categories. In addition, tabulations from the Commission's datafiles indicate that many federal guideline offenders eligible for a possible first offender reduction are also eligible for the §2D1.1 safety value adjustment and its often-overlapping eligibility criteria.

## E. Methodology

The sections below describe the recidivism research project and the definitions of recidivism used in the analysis.

### 1. The Recidivism Project

The recidivism study data are a stratified, random sample of 6,062 U.S. citizens[19] who were sentenced under the federal sentencing guidelines in fiscal year 1992.[20] Data on criminal behavior prior to the federal instant offense, as well as demographic and offender characteristics, were collected from the federal pre-sentence reports (PSRs) and other court documents submitted to the Sentencing Commission by U.S. district courts. Prison release date information was extracted from the SENTRY datafile of the Federal Bureau of Prisons in the U.S. Department of Justice. Recidivism information was obtained from the "RAP" sheet data of the Federal Bureau of Investigation's Criminal Justice Information Services Division office.

---

[19]Due to alien deportation following conviction for criminal behavior, it is difficult to measure recidivism of noncitizens convicted of federal crimes. A companion report in this recidivism project series, "Recidivism of Fiscal Year 1995 Noncitizen Federal Offenders," addresses citizenship issues in recidivism research.

[20]Details on the structure, methodology, and statistical techniques of the analysis are documented in the project's companion report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

The sample of offenders used in the recidivism analysis represents the 28,519 U.S. citizen federal offenders in the Commission's 1992 fiscal year sentencing datafile where the following "two year window inclusion" conditions were met:

- a pre-sentence report (PSR) from a fiscal year 1992 sentencing was submitted to the Sentencing Commission;

- a "RAP" sheet was located on the FBI datafile; and

- for offenders receiving prison sentences, the release from prison occurred at least two years prior to June 1, 2001.

Given the project schedule for "RAP" sheet collection in October 2001, an offender must have been released from prison by June 1, 1999.  Because the sampled offenders were sentenced in fiscal year 1992 (i.e., between October 1, 1991 and September 30, 1992), prison sentences as long as seven years are available for study.[21]  The selection of these specific dates reflects the Commission's interest in the recidivism impact of mandatory minimum sentences.  The effect of five year mandatory minimum sentences can be analyzed using the project's sampling strategy.

With the study's prison release deadline established as June 1, 2001, there were offenders in the sample who either were still in prison on this date, or had at this time been released prison for less than two years.  For the entire recidivism sample, 14.7 percent of sample offenders are not in the analysis because they had not finished serving their prison time or did not have a two year "at risk" window of opportunity.[22]  With respect to the first offender analysis, however, the focus is upon CHC I.  A total of 91.3 percent of offenders in CHC I meet the two year window inclusion conditions and are in the analysis.  This results in an unweighted sample with 1,389 offenders in CHC I, of whom 1,128 had zero criminal history points.

## 2.  Definitions

Recidivism results are presented using two substantive definitions.  The first, or "primary," definition includes the first of any one of the three following events during the offender's first two years back in the community:

- a re-conviction for a new offense;

---

[21]While the two year recidivism follow-up period limit was set at June 1, 2001, the actual collection of FBI "RAP" sheet data did not occur until October 2001.  The four month delay between June and October assured that "RAP" sheet data would reflect all events prior to June 1.  The intervening months accounted for administrative processing time to update fingerprint card information on the FBI datafile, thus minimizing any potential bias due to the states' differential schedules for reporting data to the FBI.

[22]This figure represents the sum of the sample offenders who by June 1, 2001, were still in prison (8.9%), who had died (0.4%), or had not been released for at least two years (5.4%).

- a re-arrest with no conviction disposition information available on the post-release criminal history record;[23] or

- a supervision revocation (probation or post prison supervision).

The second "re-conviction only" recidivism definition limits recidivism to the first re-conviction during the two year follow-up period. It uses only the first of the three events in the primary recidivism measure listed above.

The use of two different recidivism definitions addresses the state of post-release criminal behavior records. The recidivism literature recognizes that the FBI offender "RAP" sheets are the most accurate and readily available data source for repeat criminal behavior. However, "RAP" sheets can contain errors or partial information. For example, "RAP" sheets only contain information on offenses for which offender fingerprints were obtained. Additionally, depending on the reporting policies and practices of local jurisdictions, arrest dispositions may not always be transferred to the FBI for inclusion on "RAP" sheets. "RAP" sheets will underreport actual criminal behavior, and will underreport convictions resulting from arrests. For this reason, recidivism studies (including all of the Commission's previous recidivism study reports) commonly cite recidivism rates separately for what is termed here the "primary" and "re-conviction" definitions. However, these same studies also argue that, compared to the "re-conviction" definition, the "primary" recidivism definition is a more reliable and valid measure for the probability of actual re-offending because of its inclusiveness and its high association with actual re-offending.[24] Also, because these two definitions are highly correlated, the research findings resulting from the two definitions are highly related and lead to nearly identical conclusions, although the magnitude of their comparative findings differs.

Data cited throughout this paper are weighted to represent the entire comparable population of fiscal year 1992 U.S. citizen offenders sentenced under the federal guidelines.

## F. Recidivism Rates for the Proposed First Offender Groups

Exhibit 6 shows two-year recidivism rates for the various offender groupings. All offenders with zero criminal history points have a primary recidivism rate of 11.7 percent.[25] This zero point offender recidivism rate is substantially lower than the recidivism rates for offenders with only one criminal history point (22.6%),[26] or for offenders with

---

[23]Disposition information was obtained from the FBI's criminal history record ("RAP" sheet).

[24]Spohn and Holleran, 2002. The methodological arguments supporting various empirical definitions of recidivism are contained in the companion project report, "Background and Methodology of the U.S. Sentencing Commission's 2003 Recidivism Study."

[25]The re-conviction recidivism rate for zero point offenders is 3.5 percent.

[26]The re-conviction recidivism rate for one point offenders is 5.5 percent.

two or more points (36.5%)[27] combined in the CHC II through CHC VI column.

Among the potential first offender groups, group A has the lowest primary recidivism rate at 6.8 percent,[28] followed by offender group C with a rate of 8.8 percent.[29] Offenders in group B have a recidivism rate of 17.2 percent,[30] which is more than twice the rate of group A and nearly twice the rate for group C. Even with the comparatively higher recidivism rate, group B's rate is still several percentage points lower than offenders in the remaining zeroes group (21.7%).[31]

Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest. Compared to group B, which has prior arrests but no convictions, and a higher recidivism rate, it appears that prior arrests are predictive of recidivism for offenders with minimal prior criminal experience.

## G.  Pre-Instant-Offense Criminal Histories

This report section highlights differences in the prior criminal histories of groups A, B, and C and the link between arrests and recidivism. Following from the analysis above, it appears that arrests themselves, independent from convictions, predict risk of recidivism. This relationship is supported in a comparison of group A and group B. Neither group has prior convictions, but offenders in group A with no prior arrests have dramatically lower recidivism rates (6.8%) than offenders in group B with prior arrests but no convictions (17.2%). Several exhibits focus on how recidivism rates vary by the number, types, and characteristics of prior arrests.

Exhibit 7 shows the distribution of prior arrests for the proposed first offender groups and the comparison groups. The data for first offender group A are consistent with the group's definition: offenders in group A have no prior arrests. For group B first offenders, 58.6 percent have one prior arrest, 22.8 percent have two prior arrests, and 18.6 percent have three or more prior arrests. The group B arrest history is more consequential than the history of offenders in group C. For group C,[32] only a small proportion have more than three prior arrests. Those in Group B have higher levels of contact with the criminal justice system, with nearly one out of ten (10.3%) of group B offenders having four or more arrests.

---

[27]The re-conviction recidivism rate for two or more point offenders is 10.3 percent.

[28]The re-conviction recidivism rate for group A offenders is 2.5 percent.

[29]The re-conviction recidivism rate for group C offenders is 2.9 percent.

[30]The re-conviction recidivism rate for group B offenders is 5.3 percent.

[31]The re-conviction recidivism rate for Remaining Zero group offenders is 5.2 percent.

[32] All offenders in group C have at least one conviction for a minor prior offense under §4A1.2(c)(2). The arrests appearing in Exhibit 7 for group C involve only arrests not resulting in a conviction.

Information on the shape of the relationship between number of prior arrests and recidivism appears in Exhibit 8. The first offender groups A and B represent all guideline sentenced federal offenders who have never had a prior conviction. The exhibit illustrates that recidivism rates increase with the number of prior arrests. Those with only one prior arrest (and no convictions) have a recidivism rate nearly twice that of offenders with no prior arrests (13.2% versus 6.8%, respectively). Those with two or more prior arrests (and no convictions) have a recidivism rate nearly double that of those with only one prior arrest (13.2% versus 23.2%, respectively). Clearly, arrests without convictions are predictive of re-offending behavior.

An additional inquiry focuses on the types of offenses charged for past arrests that did not result in a conviction. Exhibit 9[33] again reflects the fact that first offender group A has no prior arrests. For group B first offenders, arrests without convictions are concentrated in drug trafficking (11.9%), drug possession (9.7%), assault (8.2%), fraud (8.6%), and theft (10.2%) offenses. Unfortunately, at this level of detail, the sample size for group C first offenders does not support comparisons. However, patterns across all columns of Exhibit 9 are comparable. For the different groupings of offenders in CHC I, the distribution of nonconviction arrests is similar.

These data suggest that the types of non-conviction arrests themselves do not predict recidivism. However, the reasons why these arrests did not result in convictions do show meaningful differences. Exhibit 10[34] addresses these findings. The comparison involves groups B and C because group A has no prior arrests.

For group B offenders, prior arrests are dismissed or otherwise not prosecuted less than half of the time (45.4%). In contrast, more than a quarter (26.5%) of the time the disposition of the prior arrest is pending and for another 15.7 percent of arrests, the offender is under warrant for the prior arrest, with the sum of these two categories over 40 percent.[35] Arrests either pending or under warrant will be either prosecuted or not, and when prosecuted will either result in a conviction or not. Consequently, for some portion of the pending or warranted arrests, the offender will end up with a subsequent conviction. This means that in four out of every ten prior arrests, the disposition of the group B prior arrest may result in a pre-instant offense conviction.

The situation is quite different for group C offenders, where the most common reason that a prior arrest did not receive points is that the arrest charges were dismissed. Almost 70 percent (69.8%) of arrest charges of group C offenders are dismissed or otherwise not prosecuted.[36] There is essentially no chance that any of these prior dismissals will result in a subsequent conviction.

---

[33]This information was not collected for CHC II through CHC VI and thus cannot not appear in the exhibit.

[34]This information was not collected for CHC II through CHC VI and thus cannot not appear in the exhibit.

[35]The sum of 26.5 percent and 15.7 percent is 42.2 percent.

[36]The small sample size of the group C category constrains confident citing of the proportions for most of the reasons why points were not assigned to prior offenses. However, the 69.8 percent proportion for dismissed prior arrests can be used.

The differences in group B and group C reasons for non-conviction prior arrests might be a factor in the groups' differences in recidivism rates. For group C, the prior arrests are usually dropped and not prosecuted. For group B, however, the high level of pending or warranted prior arrests may indicate latent conviction events, spared from receiving criminal history points only because of the timing of the instant offense sentencing. If this were the case, it suggests that some group B offenders may have recidivism behavioral tendencies in common with federal offenders who actually experience one, or more, prior convictions and receive the associated criminal history points. Not only is this explanation consistent with the higher recidivism rates of group B offenders, but in addition the data from the last line of Exhibit 10 also suggest that the prior arrests of group B offenders indicate greater offender culpability. A total of 16.8 percent of group B nonconviction arrests involve weapons, injury, or violence, the highest percentage among groups in CHC I.

In summary, first offender group A has the lowest recidivism rate and the least culpable criminal history. Focusing on groups B and C, however, the data reveal an interesting twist. The recidivism rates in Exhibit 6, combined with prior arrest characteristics depicted in Exhibits 7 through 10, suggest that group B offenders may have greater prior involvement, and possibly more culpable involvement, with the criminal justice system than is represented by their possession of zero criminal history points. Although group C first offenders have prior convictions (albeit for minor traffic and public order offenses which are excluded from receiving criminal history points), their prior arrest history and recidivism rates indicate that they better reflect the reduced culpability motivation underlying a first offender philosophy than do offenders in group B.

For prior arrests among first offenders, the following findings emerge. For group B first offenders there is a large representation (40.0%) of drug trafficking, drug possession, violence, and larceny offenses. For group C first offenders relatively few (18.7%) of these prior arrests were for drug trafficking, drug possession, violence, and larceny offenses. Less than two percent (1.4%) of these prior nonconviction arrests resulted in a not guilty disposition. The number of prior arrests among those with no prior convictions appears to be directly related to recidivism risk.

These results may go some way in helping to explain why offenders with prior arrests but no prior convictions, have a recidivism rate nearly three times as large as offenders with no prior arrests. The prior arrests of group B offenders suggest a correlation with serious criminal conduct prior to the sentencing of their federal instant offenses. These arrests were often for more serious offenses and typically had the charges dismissed, pending, or under warrant for almost nine out of every ten (87.6%) arrests. These data suggest that at least for some of the prior arrests for these offenders, the prior charges relate to actual prior offending, and thus generate their observed higher recidivism rates.

## H. Conclusion

This report examines recidivism risk for three plausible first offender groupings consistent with historical Commission definitions of possible first offenders. The three first offender groups all come from offenders with zero criminal history points, and are defined as follows: group A contains offenders with no prior arrests; group B contains offenders with prior arrests, but no prior convictions; and group C contains offenders with only prior

convictions that are to never count towards criminal history.  Among these groups the lowest recidivism rate is for group A with a rate of 6.8 percent.  Group B has a recidivism rate of 17.2 percent.  Group C has a recidivism rate of 8.8 percent.

Comparing recidivism rates for the three groups leads to the following conclusions regarding a first offender definition.  Group B offenders are the most problematic as candidates for first offender status.  While group B offenders have no prior convictions, it appears that the absence of prior convictions is often due to prosecutorial declinations, arrests that were pending prosecution at the time of sentencing for the instant offense, or arrests with issued outstanding warrants. Moreover, group B, with its recidivism rate of 17.2 percent, has a substantially greater risk for future offending compared to groups A and C.

Group C offenders, having been previously convicted of minor traffic or public order crimes, have only limited contact with the criminal justice system prior to their instant offense.  Also, with a recidivism rate of 8.8 percent, the overwhelming majority of group C offenders – almost nine out of ten – are not likely to recidivate.

From both culpability and recidivism risk perspectives, group A offenders, with no prior arrests,  most strongly meet the conceptual definition of the first offender category.  Offenders in group A have had no recorded contact with the criminal justice system prior to their instant federal offense.  Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.

The analysis delineates recidivism risk for offenders with minimal prior criminal history and shows that the risk is lowest for offenders with the least experience in the criminal justice system. Offenders with zero criminal history points have lower recidivism rates than offenders with one or more criminal history points.  Even among offenders with zero criminal history points, offenders who have never been arrested have the lowest recidivism rate of all.  Regardless of what definition is adopted, however, there are a myriad of legal and policy decisions to make.  For example, a "no prior arrest" first offender definition raises issues about the acceptability of using arrest data – often with incomplete disposition information – and the accuracy of prior history information sources. A "no prior conviction" definition raises issues about how to count prior convictions that are otherwise excluded from the criminal history computation due to juvenile, tribal, foreign, or decay provisions.  Other general issues involve the first offender definitions and their empirical associations with offender characteristics: certain first offender definitions will disproportionally impact demographic groups (such as women, minorities, or perhaps, noncitizens) or certain instant offense categories (such as fraud and larceny offenses).  Further, an important policy decision is required to address any overlap between first offender sentencing provisions and safety valve provisions for drug traffickers under guideline §2D1.1.

Finally, the adoption of some first offender definitions may require the court to collect information that is not currently included in the criminal history computation and thus may not be consistently reported in PSRs.  Specifically, this information may involve data on prior arrests

without dispositions and prior convictions that do not receive points.  If a first offender definition requires that PSRs collect this information, a standardized protocol may be needed to ensure that facts are collected completely and accurately.  For this report, a small comparison determined that currently arrest data from PSRs are more complete than arrest data from FBI "RAP" sheets, but it is not known what level of new information would be additionally needed on the PSRs.

    This report is the first step in an empirical discussion regarding a first offender provision.  As with prior Commission efforts, first offender definitions can be developed  and their sentencing outcomes can be estimated.  It is only now, however, with the Commission's recidivism data, that the analysis will include the impact of alternative first offender provisions on the predictive power of the guidelines' criminal history measures.



# References

Bauman, Kurt J. and Nikki L. Graf
    2000    Educational Attainment.  U.S. Census Bureau.

Delong, Elizabeth R., David M. Delong, and Daniel L. Clarke-Pearson
    1988    Comparing the areas under two or more correlated receiver operating curves: A
            nonparametric approach.  Biometrics 44:837-845.

Hosmer, David W. Jr. and Stanley Lemeshow
    1999    Applied Survival Analysis: Regression Modeling of Time to Event Data.  New York:
            Wiley.

Klein, John P. and Malvin L. Moeschberger
    1997    Survival Analysis: Techniques for Censored and Truncated Data.  New York: Springer.

Maltz, Michael D.
    1984    Recidivism.  Orlando, FL.: Academic Press.

Mariano, Marianne
    2001    Summary of Past Reports on Criminal History Categories "0" and "VII."  United States
            Sentencing Commission, Memorandum: June 15, 2001.

O'Neill, Michael E.
    2001    Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in The
            Federal System.  Boston College Law Review  42:291-348.

Ricca, Caryl
    1997    Simplification of Chapter Four: Comments from the Probation Officers Advisory Group
            to the U.S. Sentencing Commission.  Federal Sentencing Reporter 9(4):209-212.

Schmidt, Peter and Ann Dryden Witte
    1988    Predicting Recidivism Using Survival Models.  New York: Springer-Verlag.

Sphon, Cassia and David Holleran
    2002    The Effect of Imprisonment on Recidivism Rates of Felony Offenders: A Focus on Drug
            Offenders.  Criminology 40:329-357.

Swets, John A., Robyn M. Dawes, and John Monahan
    2000    Better Decisions Through Science.  Scientific American 283(4):82-87.

United States Sentencing Commission
    1989    Memorandum from Working Group on Criminal History to Phyllis Newton concerning the Proposed Amendments to Criminal History Chapter, December 20. Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    1990    Criminal History Working Group: Discussion Concerning Categories "0" and "VII," November 20. Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    1991a    Criminal History Working Group Report: Category 0, Category VII, Career Offender, October 17.  Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    1991b    Preliminary Report to the Commission: Staff Working Group on Alternatives, October 23.  Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    1997    Simplification Draft Paper on Chapter Four.  Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    2001a    Federal Sentencing Register Notice of Action, BAC2201-40/2211-01, listed under tentative priority (13).  http://ussc.gov/FEDREG/fedr07031.htm.

United States Sentencing Commission
    2001b    Sourcebook of Federal Sentencing Statistics.  Washington, D.C.: United States Sentencing Commission.

United States Sentencing Commission
    2004    Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines.  Release 1 of the Research Series on the Recidivism of Federal Guideline Offenders.  Washington, D.C.:  United States Sentencing Commission.

Exhibit 1

**Demographic Characteristics of Offenders, by Criminal History Category and Criminal History Points**
**With Details for Zero Point Offender Categories**

Recidivism Study 2003

| Demographic Characteristics | CRIMINAL HISTORY CATEGORY I | | | | | | | | | | ONE POINT OFFENDERS | | CATEGORIES II – VI TWO OR MORE POINT OFFENDERS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ZERO POINT OFFENDERS | | | | | | | | | | | | | |
| | Total Zeroes | | Group A *no arrests* | | Group B *no convictions* | | Group C *never-count conv*[1] | | Remaining Zeroes | | | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 | 11,672 | 100.0 |
| **Gender** | | | | | | | | | | | | | | |
| Female | 4,459 | 30.0 | 3,308 | 37.4 | 653 | 26.1 | *103‡* | *22.3* | 395 | 13.0 | 463 | 14.4 | 1,057 | 9.1 |
| Male | 10,386 | 70.0 | 5,546 | 62.6 | 1,846 | 73.9 | 357 | 77.7 | 2,637 | 87.0 | 2,758 | 85.6 | 10,615 | 90.9 |
| **Race/Ethnicity** | | | | | | | | | | | | | | |
| White | 9,365 | 63.5 | 5,849 | 66.1 | 1,471 | 58.9 | 270 | 62.0 | 1,775 | 59.8 | 1,930 | 61.0 | 5,773 | 50.0 |
| Black | 3,798 | 25.7 | 2,016 | 22.8 | 738 | 29.5 | 119 | 27.2 | 926 | 31.2 | 959 | 30.3 | 4,838 | 41.8 |
| Hispanic | 1,173 | 8.0 | 756 | 8.5 | 237 | 9.5 | *23‡* | *5.2* | 157 | 5.3 | 195 | 6.2 | 703 | 6.1 |
| Other[2] | 420 | 2.8 | 233 | 2.6 | *52‡* | *2.1* | *24‡* | *5.6* | *110‡* | *3.7* | *78‡* | *2.5* | 239 | 2.1 |
| **Age** | | | | | | | | | | | | | | |
| Under 21 | 1,056 | 7.1 | 644 | 7.3 | 218 | 8.7 | *21‡* | *4.6* | 173 | 5.7 | 295 | 9.1 | 720 | 6.2 |
| 21 – 25 | 2,183 | 14.7 | 1,223 | 13.8 | 516 | 20.6 | *80‡* | *17.4* | 364 | 12.0 | 443 | 13.7 | 2,173 | 18.6 |
| 26 – 30 | 2,294 | 15.5 | 1,379 | 15.6 | 469 | 18.8 | *68‡* | *14.8* | 379 | 12.5 | 793 | 24.6 | 2,472 | 21.2 |
| 31 – 35 | 2,252 | 15.2 | 1,234 | 13.9 | 425 | 17.0 | *86‡* | *18.6* | 507 | 16.7 | 530 | 16.4 | 2,358 | 20.2 |
| 36 – 40 | 2,103 | 14.2 | 1,243 | 14.0 | 299 | 12.0 | *92‡* | *20.0* | 469 | 15.4 | 372 | 11.5 | 1,641 | 14.0 |
| 41 – 50 | 2,944 | 19.8 | 1,777 | 20.1 | 358 | 14.3 | *56‡* | *12.1* | 753 | 24.9 | 662 | 20.5 | 1,681 | 14.4 |
| Over 50 | 2,012 | 13.6 | 1,354 | 15.3 | 214 | 8.6 | *57‡* | *12.5* | 387 | 12.8 | 136 | 4.2 | 627 | 5.4 |

[1] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).
[2] "Other" race category includes Native Americans and Asians.
‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.
SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 2
**Social and Personal Characteristics of Offenders, by Criminal History Category and Criminal History Points**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

| Social/ Personal Characteristics | Total Zeroes | | Group A *no arrests* | | Group B *no convictions* | | Group C *never-count conv*[1] | | Remaining Zeroes | | ONE POINT OFFENDERS | | TWO OR MORE POINT OFFENDERS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 | 11,672 | 100.0 |
| **Illicit Drug Use**[2] | | | | | | | | | | | | | | |
| No Illicit Drug Use | 11,072 | 74.6 | 7,002 | 79.1 | 1,804 | 72.2 | 359 | 78.0 | 1,907 | 62.9 | 2,184 | 67.6 | 6,345 | 54.4 |
| Illicit Drug Use | 3,773 | 25.4 | 1,852 | 20.9 | 695 | 27.8 | *101‡* | *22.0* | 1,125 | 37.1 | 1,046 | 32.4 | 5,325 | 45.6 |
| **Employment Status**[3] | | | | | | | | | | | | | | |
| Unemployed | 2,301 | 15.5 | 1,175 | 13.3 | 461 | 18.4 | *44‡* | *9.5* | 622 | 20.5 | 447 | 13.8 | 3,778 | 32.4 |
| Employed | 12,544 | 84.5 | 7,679 | 86.7 | 2,038 | 81.6 | 416 | 90.5 | 2,411 | 79.5 | 2,784 | 86.2 | 7,894 | 67.6 |
| **Marital Status** | | | | | | | | | | | | | | |
| Never Married | 4,004 | 27.0 | 2,131 | 24.1 | 842 | 33.7 | 131 | 28.5 | 900 | 29.7 | 896 | 27.7 | 4,688 | 40.2 |
| Legal Marriage | 6,509 | 43.8 | 4,253 | 48.0 | 848 | 33.9 | 204 | 44.3 | 1,204 | 39.7 | 1,277 | 39.5 | 2,694 | 23.1 |
| Divorced | 1,975 | 13.3 | 1,079 | 12.2 | 309 | 12.4 | *56‡* | *12.1* | 532 | 17.6 | 380 | 11.8 | 1,897 | 16.2 |
| Other[4] | 2,357 | 15.9 | 1,391 | 15.7 | 501 | 20.0 | *70‡* | *15.1* | 396 | 13.1 | 677 | 21.0 | 2,393 | 20.5 |

Table headers: CRIMINAL HISTORY CATEGORY I (ZERO POINT OFFENDERS covering Total Zeroes, Group A, Group B, Group C, Remaining Zeroes, plus ONE POINT OFFENDERS); CATEGORIES II – VI (TWO OR MORE POINT OFFENDERS).

[1] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).
[2] Illicit drug use during the year prior to the instant offense.  Missing values counted as "No"illicit drug use.
[3] Employment status during the year prior to the instant offense.  "Employed" includes alternative forms of employment and "Unemployed" includes missing values.
[4] "Other" marital status includes "Co-habitating," "Widowed," and "Separated."
‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.
SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 3

**Social and Personal Characteristics of Offenders, by Criminal History Category and Criminal History Points**

**With Details for Zero Point Offender Categories**

Recidivism Study 2003

| Social/ Personal Characteristics | CRIMINAL HISTORY CATEGORY I | | | | | | | | | | | | CATEGORIES II – VI | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ZERO POINT OFFENDERS | | | | | | | | | | ONE POINT OFFENDERS | | TWO OR MORE POINT OFFENDERS | |
| | Total Zeroes | | Group A *no arrests* | | Group B *no convictions* | | Group C *never-count conv*[1] | | Remaining Zeroes | | | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 | 11,672 | 100.0 |
| **Mental Illness**[2] | | | | | | | | | | | | | | |
| No | 13,170 | 90.4 | 7,874 | 90.5 | 2,201 | 90.0 | 416 | 90.5 | 2,679 | 90.3 | 2,931 | 91.7 | 10,087 | 88.4 |
| Yes | 1,407 | 9.7 | 832 | 9.6 | 244 | 10.0 | *44‡* | *9.5* | 288 | 9.7 | 266 | 8.3 | 1,327 | 11.6 |
| **Prior Military Service** | | | | | | | | | | | | | | |
| No | 12,326 | 83.0 | 7,437 | 84.0 | 2,166 | 86.7 | 371 | 80.7 | 2,352 | 77.6 | 2,666 | 82.5 | 10,053 | 86.1 |
| Yes | 2,520 | 17.0 | 1,417 | 16.0 | 333 | 13.3 | *89‡* | *19.3* | 680 | 22.4 | 564 | 17.5 | 1,620 | 13.9 |
| **Educational Attainment**[3] | | | | | | | | | | | | | | |
| < Than High School | 3,872 | 26.2 | 1,961 | 22.2 | 703 | 28.2 | *70‡* | *15.1* | 1,139 | 37.8 | 1,066 | 33.0 | 5,122 | 44.2 |
| High School | 5,820 | 39.4 | 3,541 | 40.1 | 987 | 39.7 | 230 | 50.1 | 1,062 | 35.3 | 1,138 | 35.2 | 4,355 | 37.6 |
| Some College | 3,396 | 23.0 | 2,122 | 24.1 | 597 | 24.0 | 103 | 22.3 | 575 | 19.1 | 835 | 25.9 | 1,758 | 15.1 |
| College Graduate | 1,691 | 11.4 | 1,196 | 13.6 | 203 | 8.1 | *57‡* | *12.5* | 235 | 7.8 | 192 | 5.9 | 362 | 3.1 |
| **Financial Dependants**[4] | | | | | | | | | | | | | | |
| 0 | 5,729 | 40.6 | 3,261 | 38.4 | 996 | 43.0 | 200 | 43.6 | 1,272 | 44.9 | 1,336 | 43.2 | 5,599 | 52.4 |
| 01 – 04 | 7,827 | 55.5 | 4900 | 57.7 | 1,247 | 53.8 | 249 | 54.2 | 1,431 | 50.5 | 1,647 | 53.3 | 4,642 | 43.5 |
| 05 – 10 | 544 | 3.9 | 329 | 3.9 | *75‡* | *3.2* | *10‡* | *2.3* | 129 | 4.6 | *110‡* | *3.5* | 442 | 4.1 |

[1] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

[2] Mental Illness is defined as any mention of a mental illness regardless of whether or not the claim was verified by a doctor.  Alcohol and illicit drug abuse/addiction were excluded.

[3] Educational Attainment at the time of the instant offense.

[4] Number of individuals to whom the offender provided financial support during the year prior to the instant offense.

‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.

SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 4
**Instant Offense Characteristics for Offenders, by Criminal History Category and Criminal History Points**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

| Instant Offense Characteristics | CRIMINAL HISTORY CATEGORY I | | | | | | | | | | | | CATEGORIES II – VI | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ZERO POINT OFFENDERS | | | | | | | | | | ONE POINT OFFENDERS | | TWO OR MORE POINT OFFENDERS | |
| | Total Zeroes | | Group A (no arrests) | | Group B (no convictions) | | Group C (never-count conv[1]) | | Remaining Zeroes | | | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| TOTAL | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 | 11,672 | 100.0 |
| **Primary Sentencing Guideline** | | | | | | | | | | | | | | |
| §2D1.1 *(drug traf.)* | 4,924 | 33.2 | 2,311 | 26.1 | 1,228 | 49.1 | 158 | 34.6 | 1,226 | 40.5 | 1,413 | 43.7 | 4,761 | 40.8 |
| §2F1.1 *(fraud)* | 3,144 | 21.2 | 2,241 | 25.3 | 370 | 14.8 | 68‡ | 14.8 | 465 | 15.3 | 486 | 15.0 | 1,326 | 11.4 |
| §2B1.1 *(theft)* | 2,578 | 17.4 | 2,049 | 23.2 | 217 | 8.7 | 82‡ | 18.2 | 230 | 7.6 | 426 | 13.2 | 640 | 5.5 |
| §2K2.1 *(weapon)* | 256 | 1.7 | 87‡ | 1.0 | 57‡ | 2.3 | 23‡ | 4.9 | 89‡ | 2.9 | 122 | 3.8 | 1,667 | 14.3 |
| §2B3.1 *(robbery)* | 316 | 2.1 | 115 | 1.3 | 84‡ | 3.4 | 12‡ | 2.6 | 105‡ | 3.5 | 94‡ | 2.9 | 1,094 | 9.4 |
| **Dangerous Instant Offense[2]** | | | | | | | | | | | | | | |
| **Yes** | 1,941 | 13.1 | 824 | 9.3 | 461 | 18.4 | 45‡ | 9.8 | 611 | 20.2 | 723 | 22.4 | 3,836 | 32.9 |
| **Culpability Criteria[3]** | | | | | | | | | | | | | | |
| *1. No Viol. or Weap.* | 12,925 | 87.1 | 8,051 | 90.9 | 2,028 | 81.1 | 404 | 87.9 | 2,442 | 80.5 | 2,552 | 79.0 | 7,908 | 67.8 |
| *2. No Bodily Injury* | 14,749 | 99.3 | 8,833 | 99.8 | 2,457 | 98.3 | 460 | 100.0 | 2,999 | 98.9 | 3,210 | 99.4 | 11,498 | 98.4 |
| *3. Mitigating Role* | 13,655 | 92.0 | 8,119 | 91.7 | 2,298 | 92.0 | 458 | 99.6 | 2,779 | 91.6 | 2,918 | 90.3 | 10,683 | 91.5 |
| *4. Acceptance of Resp.* | 12,373 | 83.3 | 7,562 | 85.4 | 2,050 | 82.0 | 374 | 81.4 | 2,386 | 78.7 | 2,644 | 81.8 | 8,819 | 75.6 |
| *Meet All Four Above Culpability Criteria* | 10,356 | 69.8 | 6,532 | 73.8 | 1,623 | 64.9 | 327 | 71.2 | 1,873 | 61.8 | 2,000 | 61.9 | 5,782 | 49.5 |

[1] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

[2] Dangerousness indicates whether or not an offender during the Commission of their instant offense either threatened or caused actual violence or injury and or a weapon was involved.  Missing values are counted as "No" dangerousness present.

[3] §5C1.2 - Limitation on Applicability of Statutory Minimum Sentences in Certain Cases.  Examines Safety Valve eligibility criteria - §5C1.2(a)(2), §5C1.2(a)(3), §5C1.2(a)(4), §5C1.2(a)(5), excluding §5C1.2(a) and §5C1.2(a)(1) exclusions.

‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.

SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 5
**Sentence Characteristics for Offenders, by Criminal History Category and Criminal History Points**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

| Sentence Characteristics | Total Zeroes N | % | Group A *no arrests* N | % | Group B *no convictions* N | % | Group C *never-count conv*[1] N | % | Remaining Zeroes N | % | One Point Offenders N | % | Two or More Point Offenders N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CRIMINAL HISTORY CATEGORY I | | | | | | | | | | | | CATEGORIES II – VI | |
| | ZERO POINT OFFENDERS | | | | | | | | | | ONE POINT OFFENDERS | | TWO OR MORE POINT OFFENDERS | |
| **TOTAL** | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 | 11,672 | 100.0 |
| **Type of Sentence**[2] | | | | | | | | | | | | | | |
| Fine Only | 134 | 0.9 | 121 | 1.4 | *0‡* | *0.0* | *0‡* | *0.0* | *12‡* | *0.4* | *12‡* | *0.4* | *3‡* | *0.0* |
| Probation Only | 3,646 | 24.6 | 2,685 | 30.3 | 364 | 14.6 | *87‡* | *18.9* | 510 | 16.8 | 562 | 17.4 | 572 | 4.9 |
| Probation +Alternatives | 2,768 | 18.7 | 1,894 | 21.4 | 340 | 13.7 | 121 | 26.4 | 413 | 13.6 | 486 | 15.0 | 542 | 4.7 |
| Prison + Alternatives | 818 | 5.5 | 503 | 5.7 | 126 | 5.1 | *10‡* | *2.3* | 178 | 5.9 | 168 | 5.2 | 392 | 3.4 |
| Prison | 7,467 | 50.3 | 3,650 | 41.2 | 1,657 | 66.6 | 241 | 52.4 | 1,919 | 63.3 | 2,003 | 62.0 | 10,163 | 87.1 |
| **Length of Sentence**[3] | | | | | | | | | | | | | | |
| 0 | 6,560 | 44.4 | 4,701 | 53.3 | 716 | 28.8 | 208 | 45.3 | 935 | 31.0 | 1,060 | 33.0 | 1,117 | 9.6 |
| 01 – 05 | 1,059 | 7.2 | 640 | 7.3 | 157 | 6.3 | *31‡* | *6.8* | 231 | 7.7 | 273 | 8.5 | 421 | 3.6 |
| 06 – 11 | 797 | 5.4 | 419 | 4.8 | 136 | 5.5 | *21‡* | *4.6* | 220 | 7.3 | 241 | 7.5 | 800 | 6.9 |
| 12 – 23 | 1,678 | 11.3 | 912 | 10.3 | 315 | 12.6 | *63‡* | *13.7* | 388 | 12.9 | 294 | 9.2 | 1,770 | 15.2 |
| 24 – 59 | 2,014 | 13.6 | 1,017 | 11.5 | 503 | 20.2 | *84‡* | *18.2* | 409 | 13.6 | 461 | 14.4 | 2,809 | 24.2 |
| 60 or More | 2,674 | 18.1 | 1,133 | 12.8 | 661 | 26.6 | *52‡* | *11.4* | 828 | 27.5 | 881 | 27.4 | 4,704 | 40.5 |
| **Points for Mitigating Role** | | | | | | | | | | | | | | |
| 0 points | 13,537 | 91.6 | 8,060 | 91.4 | 2,213 | 89.4 | 427 | 95.0 | 2,837 | 93.6 | 2,902 | 90.1 | 10,936 | 94.5 |
| -2 points | 879 | 6.0 | 527 | 6.0 | 199 | 8.0 | *23‡* | *5.0* | 131 | 4.3 | 239 | 7.4 | 482 | 4.2 |
| -3 points | *31‡* | *0.2* | *10‡* | *0.1* | *10‡* | *0.4* | *0‡* | *0.0* | *10‡* | *0.4* | *10‡* | *0.3* | 46 | 0.4 |
| -4 points | 330 | 2.2 | 221 | 2.5 | *54‡* | *2.2* | *0‡* | *0.0* | *54‡* | *1.8* | *70‡* | *2.2* | 110 | 1.0 |

[1] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

[2] The type of sentenced given for the offender's instant offense.

[3] The sentence imposed for the offender's instant offense, presented in months.

‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.

SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 6

**Recidivism Rates, by Criminal History Category and Criminal History Points**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **CRIMINAL HISTORY CATEGORY I** | | | | | | | | | | | | **CATEGORIES II – VI** | | |
| | **ZERO POINT OFFENDERS** | | | | | | | | | | **ONE POINT OFFENDERS** | | **TWO OR MORE POINT OFFENDERS** | |
| | **Total Zeroes** | | **Group A** *no arrests* | | **Group B** *no convictions* | | **Group C** *never-count conv*[2] | | **Remaining Zeroes** | | | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL**[1] | 12,546 | 100.0 | 7,448 | 100.0 | 2,089 | 100.0 | 416 | 100.0 | 2,592 | 100.0 | 2,882 | 100.0 | 8,895 | 100.0 |
| **Primary Recidivism Definition**[3] | | | | | | | | | | | | | | |
| Did Recidivate | 1,465 | 11.7 | 508 | 6.8 | 359 | 17.2 | *36‡* | *8.8* | 561 | 21.7 | 650 | 22.6 | 3,250 | 36.5 |
| Did *NOT* Recidivate | 11,081 | 88.3 | 6,940 | 93.2 | 1,730 | 82.8 | 380 | 91.2 | 2,031 | 78.3 | 2,231 | 77.4 | 5,646 | 63.5 |
| **Re-Conviction Recidivism Definition**[4] | | | | | | | | | | | | | | |
| Did Recidivate | 442 | 3.5 | 184 | 2.5 | *111‡* | *5.3* | *12‡* | *2.9* | 134 | 5.2 | 158 | 5.5 | 913 | 10.3 |
| Did *NOT* Recidivate | 12,104 | 96.5 | 7,264 | 97.5 | 1,978 | 94.7 | 404 | 97.1 | 2,458 | 94.8 | 2,723 | 94.5 | 7,981 | 89.7 |

[1] Number of offenders with a 24 month period at risk of recidivating following either initiation of probation (for offenders receiving probation-only sentences) or release from confinement (for those offenders receiving confinement sentences).

[2] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

[3] Primary recidivism definition based on offender's re-arrest, including supervised release/ probation violations, re-arrest, or re-conviction.

[4] Re-conviction recidivism definition based solely on the offender's re-conviction, excluding any supervised release/ probation violations or re-arrests.

‡ Indicates fewer than 10 sample subjects. Findings may not be statistically significant.

SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data. Missing data are excluded, unless specified.

Exhibit 7
**Number of Prior Arrests,[1] by Criminal History Category I**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

| Offender's Number of Prior Arrests[1] | CRIMINAL HISTORY CATEGORY I | | | | | | | | | | | ONE POINT OFFENDERS | |
| | ZERO POINT OFFENDERS | | | | | | | | | | | | |
| | Total Zeroes | | Group A no arrests[2] | | Group B no convictions | | Group C never-count conv[3] | | Remaining Zeroes | | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % | |
| TOTAL | 14,845 | 100.0 | 8,854 | 100.0 | 2,499 | 100.0 | 460 | 100.0 | 3,032 | 100.0 | 3,231 | 100.0 |
| 0 Arrests | 10,710 | 72.1 | 8,854 | 100.0 | 0‡ | 0.0 | 303 | 65.9 | 1,553 | 51.2 | 1,722 | 53.3 |
| 01  Arrest | 2,265 | 15.3 | 0 | 0.0 | 1,465 | 58.6 | 124 | 26.9 | 677 | 22.3 | 685 | 21.2 |
| 02  Arrests | 992 | 6.7 | 0 | 0.0 | 570 | 22.8 | 23‡ | 4.9 | 400 | 13.2 | 363 | 11.2 |
| 03  Arrests | 387 | 2.6 | 0 | 0.0 | 207 | 8.3 | 10‡ | 2.3 | 169 | 5.6 | 183 | 5.7 |
| 04 – 09  Arrests | 469 | 3.2 | 0 | 0.0 | 257 | 10.3 | 0‡ | 0.0 | 212 | 7.0 | 225 | 7.0 |
| 10+  Arrests | 21‡ | 0.1 | 0 | 0.0 | 0‡ | 0.0 | 0‡ | 0.0 | 21‡ | 0.7 | 52‡ | 1.6 |

[1] Prior arrests that did not result in a conviction (i.e., these arrests were found not guilty, dismissed, were pending, on warrant status, or disposition records could not be located by P.O.).
[2] Group A offender's do not have prior arrests, by definition.
[3] Prior Arrests with no dispositions and only for "never-count" convictions for the offenses specifically listed in §4A1.2(c)(2).
‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.
SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 8

**Recidivism Rates, by Prior Arrests for Offenders
With No Prior Convictions**
(First Offender Group A and Group B)

| **Offender's Number of Prior Arrests** | **Two-Year Recidivism Rates** |
|---|---|
| **Group A** | |
| 0 arrests | 6.8 |
| **Group B** | |
| 1 arrest | 13.2 |
| 2 or more arrests | 23.2 |

SOURCE: U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.

Exhibit 9
**Type of Counts That Did Not End in a Conviction,[1] by Criminal History Category I**
**With Details for Zero Point Offender Categories**
Recidivism Study 2003

### CRIMINAL HISTORY CATEGORY I

| Type of Counts That Did Not End in a Conviction | Total Zeroes N | Total Zeroes % | Group A no arrests N | Group A no arrests % | Group B no convictions N | Group B no convictions % | Group C never-count conv[2] N | Group C never-count conv[2] % | Remaining Zeroes N | Remaining Zeroes % | ONE POINT OFFENDERS N | ONE POINT OFFENDERS % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | ZERO POINT OFFENDERS | | | | | | | | | |
| TOTAL [1] | 10,270 | 100.0 | 0 | 100.0 | 5,935 | 100.0 | 233 | 100.0 | 4,102 | 100.0 | 4,626 | 100.0 |
| **Drug Trafficking** | | | | | | | | | | | | |
| Cocaine | 309 | 3.0 | | | 265 | 4.5 | 0‡ | 0.0 | 44‡ | 1.1 | 99‡ | 2.1 |
| Crack | 87‡ | 0.8 | | | 77‡ | 1.3 | 0‡ | 0.0 | 10‡ | 0.3 | 23‡ | 0.5 |
| Marijuana | 171 | 1.7 | | | 108‡ | 1.8 | 0‡ | 0.0 | 63‡ | 1.5 | 111‡ | 2.4 |
| Other | 360 | 3.5 | | | 253 | 4.3 | 10‡ | 4.5 | 96‡ | 2.3 | 211 | 4.6 |
| **Drug Possession** | | | | | | | | | | | | |
| Cocaine | 224 | 2.2 | | | 150 | 2.5 | 0‡ | 0.0 | 73‡ | 1.8 | 105‡ | 2.3 |
| Marijuana | 436 | 4.2 | Group A Offenders Have No Prior Arrests/Counts | | 229 | 3.8 | 12‡ | 5.2 | 195 | 4.8 | 153 | 3.3 |
| Other | 361 | 3.5 | | | 200 | 3.4 | 0‡ | 0.0 | 161 | 3.9 | 105‡ | 2.3 |
| **Assault** | | | | | | | | | | | | |
| Battery | 370 | 3.6 | | | 161 | 2.7 | 21‡ | 9.0 | 188 | 4.6 | 108‡ | 2.3 |
| Aggravated | 234 | 2.3 | | | 117 | 2.0 | 0‡ | 0.0 | 117 | 2.8 | 117 | 2.5 |
| Simple | 63‡ | 0.6 | | | 42‡ | 0.7 | 0‡ | 0.0 | 21‡ | 0.5 | 42‡ | 0.9 |
| Other | 263 | 2.6 | | | 164 | 2.8 | 0‡ | 0.0 | 99‡ | 2.4 | 150 | 3.2 |
| **Fraud** | | | | | | | | | | | | |
| Insufficient Check | 354 | 3.4 | | | 278 | 4.7 | 33‡ | 14.2 | 44‡ | 1.1 | 403 | 8.7 |
| Other | 295 | 2.9 | | | 230 | 3.9 | 0‡ | 0.0 | 65‡ | 1.6 | 120 | 2.6 |

Exhibit 9 Continued . . .

Exhibit 9 Continued

## CRIMINAL HISTORY CATEGORY I

| Type of Counts That Did Not End in a Conviction | ZERO POINT OFFENDERS | | | | | | | | | | ONE POINT OFFENDERS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total Zeroes | | Group A no arrests | | Group B no convictions | | Group C never-count conv[2] | | Remaining Zeroes | | | |
| | N | % | N | % | N | % | N | % | N | % | N | % |
| **TOTAL** [1] | **10,270** | **100.0** | **0** | **100.0** | **5,935** | **100.0** | **233** | **100.0** | **4,102** | **100.0** | **4,626** | **100.0** |
| **Larceny** | | | | | | | | | | | | |
| Grand | 162 | 1.6 | | | *110‡* | *1.8* | *0‡* | *0.0* | *52‡* | *1.3* | 117 | 2.5 |
| Petty | 181 | 1.8 | | | 113 | 1.9 | *0‡* | *0.0* | *68‡* | *1.6* | *91‡* | *1.9* |
| Shoplifting | 166 | 1.6 | | | *101‡* | *1.7* | *0‡* | *0.0* | *65‡* | *1.6* | *31‡* | *0.7* |
| Burglary | 208 | 2.0 | | | 131 | 2.2 | *0‡* | *0.0* | *77‡* | *1.9* | *89‡* | *1.9* |
| Other | 345 | 3.4 | | | 153 | 2.6 | *0‡* | *0.0* | 192 | 4.7 | 239 | 5.2 |
| **Traffic** | | | Group A Offenders Have No Prior Arrests/Counts | | | | | | | | | |
| DUI | 441 | 4.3 | | | 225 | 3.8 | *0‡* | *0.0* | 216 | 5.3 | 204 | 4.4 |
| Reckless Driving | 200 | 1.9 | | | 155 | 2.6 | *23‡* | *9.7* | *23‡* | *0.5* | *21‡* | *0.5* |
| Driving w/o a License or Suspended | 368 | 3.6 | | | 131 | 2.2 | *23‡* | *9.7* | 215 | 5.2 | 164 | 3.5 |
| Other | 623 | 6.1 | | | 370 | 6.2 | *0‡* | *0.0* | 253 | 6.2 | 248 | 5.4 |
| **Other** | | | | | | | | | | | | |
| Failure to Appear/ Pay Fine | 426 | 4.1 | | | *99‡* | *1.7* | *0‡* | *0.0* | 326 | 7.9 | 245 | 5.3 |
| All Other Offenses | 3,623 | 35.3 | | | 2,073 | 34.9 | *111‡* | *47.7* | 1,439 | 35.1 | 1,427 | 30.9 |

[1] The disposition of these counts were either dismissed, not guilty, pending, on warrant status, the disposition could not be located by the P.O., or anything else other than guilty.  The N does not represent people, cases, or arrests rather the number of *counts* for each variable.

[2] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.

SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.

Exhibit 10
**Prior Arrest Characteristics,[1] by Criminal History Category I
With Details for Zero Point Offender Categories**
Recidivism Study 2003

## CRIMINAL HISTORY CATEGORY I

| Prior Arrest Characteristics | Total Zeroes N | % | Group A *no arrests* N | % | Group B *no convictions* N | % | Group C *never-count conv[2]* N | % | Remaining Zeroes N | % | ONE POINT OFFENDERS N | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL[1]** | 8,059 | 100.0 | 0 | 100.0 | 4,545 | 100.0 | 200 | 100.0 | 3,313 | 100.0 | 3,723 | 100.0 |
| **Disposition of Arrest** | | | | | | | | | | | | |
| Not Guilty | 187 | 2.5 | | | *56‡* | *1.4* | *0‡* | *0.0* | 131 | 4.0 | *75‡* | *2.0* |
| Dismissed | 3,312 | 44.8 | | | 1,780 | 45.4 | 133 | 69.8 | 1,400 | 42.7 | 1,625 | 44.2 |
| Pending | 1,927 | 26.1 | Group A | | 1,037 | 26.5 | *24‡* | *12.8* | 866 | 26.4 | 1,208 | 32.8 |
| Warrant | 780 | 10.6 | Offenders | | 617 | 15.7 | *0‡* | *0.0* | 164 | 5.0 | *42‡* | *1.1* |
| P.O. Not Find Disposition Record | 1,067 | 14.4 | Have No Prior | | 369 | 9.4 | *33‡* | *17.4* | 665 | 20.2 | 721 | 19.6 |
| Other | 119 | 1.6 | Arrests/Counts | | *63‡* | *1.6* | *0‡* | *0.0* | *56‡* | *1.7* | *10‡* | *0.3* |
| **Dangerous Prior Arrest Conduct[3]** | | | | | | | | | | | | |
| Yes | 1,176 | 14.6 | | | 764 | 16.8 | *0‡* | *0.0* | 412 | 12.4 | 204 | 5.5 |

---

[1] Prior arrests that did not result in a conviction (i.e., these arrests were found not guilty, dismissed, were pending, on warrant status, or disposition records could not be located by P.O.). The N represents the total number of prior arrests not leading to convictions.

[2] Prior Arrests with no dispositions and convictions for only the "never-count" offenses specifically listed in §4A1.2(c)(2).

[3] Dangerousness indicates whether or not an offender in the Commission of their prior arrest either threatened or caused actual violence or injury and or a weapon was involved.  Missing values are counted as "No" dangerousness present.

‡ Indicates fewer than 10 sample subjects.  Findings may not be statistically significant.

SOURCE:  U.S. Sentencing Commission, FY1992 Recidivism Sample (U.S. Citizens), 2003, weighted data.  Missing data are excluded, unless specified.